### LADD v. UNION MUT. LIFE INS. CO. OF MAINE.

(Circuit Court, W. D. Missouri, W. D. July 7, 1902.)

No. 2,429.

1. NOTES—TIME OF MATURITY.

Plaintiff's intestate executed certain renewal notes, agreeing in writing that if they were not paid at their due dates "the right to take action on notes or collateral is as fully preserved as if the original notes had not been surrendered"; that the existing collaterals should be held by

the payee until a certain date, new collaterals to be then substituted at the payee's demand, or, if intestate should fail to substitute such new collaterals, "that the notes  *  *  *  shall all become due at that time." *Held*, that the mere failure of intestate to pay one of the notes at maturity did not mature the remaining notes.

2. INSURANCE POLICY—ACTION BY ADMINISTRATOR—INDIVIDUAL CAPACITY.

An action on an insurance policy payable to insured's "executors, administrators, or assigns" cannot be maintained by the administrator in his individual capacity.

3. SAME—NATURE OF INSURED'S INTEREST DURING LIFE—RIGHT OF SET-OFF IN COMPANY.

Intestate took out a 20-year endowment policy in defendant company, payable to his "executors, administrators, or assigns," and containing a provision that "after the payment of three full premiums in cash the policy is entitled to the benefits of the Maine nonforfeitable law, and, if the policy shall become entitled to an extension under said law, it shall be governed by the provisions of said law applicable to endowment policies." It also provided that "the company will not notice any assignment of this policy until the original or duplicate thereof shall be filed in the home office." Insured at the time of his death had paid eleven premiums, and would have been entitled had he lived to extension insurance for five years without further payments. *Held*, that insured at the time of his death had a present valuable interest in the policy, and that the proceeds thereof did not constitute a mere trust fund belonging to his administrator and for the sole benefit of all insured's general creditors, and the company was therefore entitled to set off, as against the amount due on the policy, the amount of two notes executed to it by insured during his life, and due and unpaid at the time of his death, but not those which matured subsequent to his death.

This case was submitted upon an agreed statement of facts, the substance of which is as follows:

In December, 1888, the defendant company issued its policy of insurance upon the life of George F. Putnam. It was a 20-year policy upon the endowment plan. If the insured survived the 20 years he was to receive $5,000 or other substantive equivalent. In the event of his death within the period, the policy was made payable to his executor, administrator, or assigns. He died testate on May 30, 1899. The plaintiff, Sanford B. Ladd, is the duly appointed and qualified executor. The estate is insolvent, as are also the sureties on the notes, and the collateral security, hereinafter mentioned, proved to be worthless. In 1893 said Putnam, together with two other persons, executed to the insurance company two promissory notes for $3,500 each, the first due in six months and the second in twelve months after date. These notes were secured by a deposit with the defendant company of 100 shares of stock of the International Loan & Trust Company of Kansas City, Mo. The notes not being paid, in April, 1898, said Putnam and the two other persons, in renewal of said past-due notes, executed to the company eight several notes. one for $500, due June 1, 1898 (which note was promptly paid); one for $500, due June 15, 1898; one for $1,000, due January 1, 1899; one for $1,000, due July 1, 1899; one for $1,000, due January 1, 1900; one for $1,000, due July 1, 1900; one for $1,000, due January 1, 1901; and one for $1,000, due July 1, 1901. Upon their execution the old notes were surrendered. At the time of the execution of said renewal notes the makers executed to the insurance company a collateral agreement, which recited that said renewal notes were made in lieu of said $3,500 notes, executed to the company eight several notes, provisional conditions referred to in the following opinion of the court. At the time of Putnam's death the two notes, one for $500, due July 1, 1898, and the note for $1,000, due January 1, 1899, were past due and unpaid. After due proofs of death, the plaintiff, as executor under the will of said

¶ 3. See Insurance, vol. 28, Cent. Dig. § 1531.

George F. Putnam, brought this action to recover the amount of the policy in the sum of $5,000. The defendant, after admitting the general allegations of the petition, pleaded as a counterclaim the said notes executed by said Putnam to it, claiming as a basis for pleading in counterclaim the notes unmatured on their face at the time of Putnam's death that by the terms of said collateral agreement all the notes became due and payable on default of payment of the two preceding notes, due July 1, 1898, and January 1, 1899.

Sanford B. Ladd, in pro. per.
H. L. McCune, for defendant.

PHILIPS, District Judge (after stating the facts as above). I am free to admit that the question presented for decision on the agreed statement of facts is most embarrassing, so much so that different judicial minds might assign most plausible reasons for different conclusions thereon. Nothing short of the expressed mind of the court of last resort can authoritatively settle the question in this jurisdiction.

The contention of plaintiff's counsel is that no cause of action ever arose in favor of the deceased, George F. Putnam, in his lifetime on the policy in suit; that by its express terms it was made payable to his executor or administrator after his death, upon proofs, etc., and therefore no cause of action ever did or could arise in Putnam against the insurance company, and for this reason there was wanting that mutuality of indebtedness between the insurance company and the executor, the named payee of the policy, essential to constitute a legal basis for a set-off; that the plaintiff, as the named payee of the policy, after the death of the assured, when the cause of action first arose, took and held the claim as a trustee for the benefit of all the creditors of the estate of the decedent, the proceeds of which claim he would hold as a trust fund, to be distributed pro rata among all the general creditors of the estate; that to allow the insurance company, which is but a general creditor, to set off, by way of counterclaim, its demands against the estate, would be to give it a preference contrary to the established policy of the law of administration, which is to secure equality among all general creditors of an insolvent estate. These propositions, it is contended, are supported by the following cases: Patterson v. Patterson, 59 N. Y. 574, 17 Am. Rep. 384; Insurance Co. v. McKown, 33 C. C. A. 212, 90 Fed. 646, 62 U. S. App. 423; and McKown v. Insurance Co. (C. C.) 91 Fed. 352, decided by the United States circuit court of appeals for the Third circuit.

The contention of defendant is that at the time of Putnam's death he was indebted to the insurance company in the sum of the notes then held by it executed by Putnam and others; that both contracts, that of insurance and of the notes, when executed were of the nature of debitum in præsenti solvendum in futuro, and at the time of the commencement of the plaintiff's action the defendant also had a cause of action against the plaintiff as executor arising on contract, and therefore its counterclaim is within the exact provisions of the Code of the state (sections 604, 605), which provides that the answer of a defendant may consist "of any new matter constituting a defense or counterclaim," and "the counterclaim mentioned must be one

existing in favor of a defendant and against a plaintiff, between whom a several judgment might be had in the action, and arising out of one of the following causes of action: * * * Second, in an action arising on contract, any other cause of action arising also on contract, and existing at the commencement of the action." That, inasmuch as under the state statute (sections 187, 204) the defendant could have sued, in the state circuit court (or, it being a nonresident, in this court), the executor, to establish its judgment against the estate, to which the plaintiff might have interposed, by way of counterclaim, the amount due on the policy, mutatis mutandis, when the executor sues to recover from the defendant the amount of the policy it should have the right to exhibit its claim on the notes against the estate by way of counterclaim; citing in support, as to the office of a counterclaim under the Code, the cases of Transportation Co. v. Boggiano, 52 Mo. 294–295; McAdow v. Ross, 53 Mo. 199, 204, 206, 207; and the following cases contra to the rulings cited by the plaintiff's counsel (the New York case and those of the United States court of appeals, supra): The cases of Boyden v. Insurance Co., 153 Mass. 544, 27 N. E. 669, and Skiles v. Houston, 110 Pa. 254, 2 Atl. 30.

It is to be conceded to the defendant that the supreme court of Massachusetts sustains its contention, even to holding that the defendant could plead its claims as a set-off, and on the further ground (pleaded by defendant herein without objection by plaintiff), as an equitable defense, because of the insolvency of Putnam's estate. It is to be observed in this connection that in both the Massachusetts and Pennsylvania cases the right to plead set-offs recognized was limited to the debts of the intestate due at the time of his death. So that, if the view of those courts were adopted here, according to the construction placed by me on the collateral contract (Exhibit K to the agreed statement of facts), the defendant would only be entitled to have deducted from the plaintiff's claim the first two notes held by it against Putnam, one for $500, due June 15, 1898, and one for $1,000, due January 1, 1899, as Putnam died before the maturity of the other notes. Reading this collateral contract by its four corners, it seems clear to my mind that the language, "provided the notes referred to above are paid at their due dates, if not the right to take action on notes or collateral is hereby as fully reserved to said company as if the original notes for $3,500 each had not been surrendered," was intended merely to express the purpose that the collaterals put up to secure the first two notes of $3,500 each which were being renewed by the seven new notes should also be held to secure the latter, with the same right of action thereon in case of default of payment as existed on the original agreement. This is made manifest by the concluding clause of the agreement, which provides: "To hold the present collateral, consisting of 220 shares of International Loan & Trust Co. stock (given at the time the two notes for $3,500.00 each were made), until after the fourth note, which will fall due July 1, 1899, has been paid, and then, if said company demands that a different collateral shall be substituted, we hereby agree to furnish other collateral satisfactory to the management of said company, or, fail-

ing to do this, that the notes referred to herein as executed to-day shall all become due at that time." Having thus specifically stated the contingency on which, prior to the date of maturity stated on the face of the notes, all should "become due at that time,"—that is, on the occurrence of the contingency,—it must be held to preclude the idea that it was meant by the preceding provision to assert that all the notes should become due on failure to pay any one of them on maturity, with or without any demand for other security. This construction ought to prevail on the just rule that such forfeitures are harsh, and are not favorites of the courts. They are the abhorrence of courts of equity, and are never enforced by the law courts except when the intention is clearly expressed.

The nearest approach to the question involved found in the decisions of the supreme court of this state, in so far as I am advised, are the cases of Lietman's Estate v. Lietman, 149 Mo. 112, 50 S. W. 307, 73 Am. St. Rep. 374, and Bealey v. Smith, 158 Mo. 515, 59 S. W. 984, 81 Am. St. Rep. 317. In the former case it is held that a special legatee under the testator's will who was indebted to the estate could not compel payment by the executor of the legacy without paying his debt to the estate, and therefore the executor had a right to withhold the amount of the legacy; it being less than the sum of the indebtedness of the legatee. The court, while holding that this conclusion could well rest upon the equitable doctrine of "retainer," declared it was correct "whether the proceeding is called retainer, advancement, set-off, or assets in the hands of the legatee. The practical result is the same, and it rests upon wholesome principles of right and justice."

In the Bealey Case, the plaintiff, a son-in-law of the deceased, presented for allowance against the estate a balance on a note executed to him by the intestate. In the lifetime of the intestate the plaintiff had received from him for collection certain notes, which, after the death of the payee, he had collected in a sum in excess of his claim against the estate, which amount the administrator asked to have set off and allowed as a counterclaim. It was held that a set-off was maintainable, treating it as of the nature of a counterclaim; for, after allowing the demand of the plaintiff, the court set off the debt of the plaintiff to the estate, and ordered judgment over against him for the excess on the counterclaim. The case is noticeable, in respect of the question at bar, first, in that the liability of the estate to the plaintiff was due at the time of the intestate's death, while the liability of the plaintiff to the estate did not arise until after the death of the intestate, but on an implied contract made in the lifetime of the intestate, dependent on the future contingency of the plaintiff collecting the notes and his failure to account therefor; and, second, because of the line of argument and citations by the court in support of its conclusion. It was placed distinctively on the ground of the mutuality of the demands; citing with approval the language of Judge Woerner's Law of Administration. After adverting to the requirement of the statute, where demand is presented for allowance against the estate, that the claimant should disclose the existence of any set-off or counterclaim, the court observed:

"Hence the judgment can be for the difference only if there had been mutual dealings between the creditor and the decedent; and this, whether the estate is solvent or insolvent, whether the debts are payable simultaneously, or the one in præsenti and the other in futuro, or whether there be other claims superior in dignity thereby affected or not, even if the debt to the estate would not have been the proper subject of set-off during the lifetime of the parties."

The opinion concluded with the statement that:

"There can be no doubt that section 2050, Rev. St. 1889 (section 605, Rev. St. 1899), is broad enough to permit the counterclaim of the administrator against the plaintiff, for which an action of indebitatus assumpsit for money had and received would have formerly have afforded a sufficient remedy against the plaintiff's demand arising out of contract against the estate. If this were not so, an insolvent debtor could secure payment in full for his claim against a solvent estate, escape liability for what he owed the estate, and thus diminish the assets of the estate which of right belong to the other creditors or the heirs."

It would seem that the converse of this proposition ought to hold good.

It seems to me, therefore, to differentiate the case at bar, and sustain the plaintiff's position his ultimate reliance must be on the proposition that it was not only the mind of Putnam, the assured, that in making the policy payable to his administrator, etc., he made provision in the nature of a trust fund for the benefit of all of his general creditors pari passu, but that such intent is to be gathered from the contract itself. But does the provision to pay "to his executor, administrator, or assigns" mean or imply necessarily anything more than if this designation had been omitted? Without this expression, on his death the law would vest the right to this asset in his executor or administrator, with the implied trust that the proceeds should inure to the benefit equally of all his creditors. To carry out to its legal sequence the theory that it was the purpose of Putnam, in taking out the policy payable to his administrator or executor, to create a trust fund for the benefit of creditors, in case he died owing debts, the executor would have taken the policy as a special trust, with the duty imposed to apply the proceeds to the payment of the intestate's debts before he could have thus applied a dollar of the general assets therefor; whereas, under the policy, without any such express direction, he came to the right to collect the policy by virtue of his office as executor, and the fund in his hands would have no quality attached to it different from any other asset of the estate coming into his possession virtute officii, for the general payment of debts and for distribution, without the obligation of either applying the fund arising from the policy first to the payment of debts, and making a separate distinct accounting therefor. I am unable to assent to the suggestion of counsel for plaintiff that he could have maintained this action in his individual name without averring his office as executor. By the express terms of the contract of the policy, it was to be paid to the administrator, executor, or assigns; and I cannot, therefore, conceive how he could show a cause of action without averring that he was the duly appointed and qualified executor; this, for the obvious reason that no other personality was designated by the policy as entitled to collect the

same on the death of the assured than the executor or administrator, so that it was payable rather to the office than to the person.

It is observable that the provision is not only to pay the amount of said insurance to his executor or administrator, but also to his "assigns." The word "assigns" was presumably used in its ordinary acceptation, meaning "assignees,"—"those to whom property shall have been transferred." Black, Law Dict. The second paragraph of the policy, "that the company will not notice any assignment of this policy until the original or duplicate thereof shall be filed in the home office," clearly indicates the sense of the parties to the contract that the assured had an assignable interest in the policy which he might transfer in his lifetime to a third party, and on notice thereof to the company would recognize the assignee. Therefore it seems to me that neither party to the contract had any proper conception of creating an absolute trust fund not capable of diversion in the lifetime of the assured.

The policy was "for a term of 20 years," and it contained the provision "that after the payment of three full years' premiums in cash the policy is entitled to the benefits of the Maine nonforfeiture law, and, if this policy shall become entitled to an extension under said law, it shall be governed by the provisions of said law applicable to endowment policies," with the further provision as to certain options of the assured on the completion of the terms of insurance if it had not been forfeited. In such a policy, my understanding of the law is, the insured in his lifetime had a present, valuable, vendible interest. See In re Welling (C. C. A.) 113 Fed. 192–194, and citations. In Evers v. Association, 59 Mo. 429–432, the court, speaking of the terms of the policy made payable to A. in the year 1917 in case he lived to that period, but in the event of his death previously then to the trustee for the beneficiaries therein expressed, said:

"There was no joint interest in the policies during the continuance of A.'s life. While he lived he had the sole and absolute interest, with the bare contingency resulting to the other parties. Had he survived to the designated time when the payment of the policies were to inure to him personally, it is palpable that he, and he alone, would have reaped their fruits, and there could have been no pretense that any one was jointly interested with him. Legally the interest of the plaintiff (the trustee) did not take effect till A.'s interest ceased by death, and therefore there could have been no joint interest."

In Re Slingluff (D. C.) 106 Fed. 154–156, the court said:

"It is clear, I think, that a contract with an insurance company which the bankrupt (the assured) could have assigned to a person competent to accept an assignment is a contract which the bankrupt could have transferred. * * * And I think it is clear that this policy, and the benefits to be derived by the bankrupt by virtue of it, was by its terms recognized by the insurance company as an assignable contract. The policy in terms provides that it may be assigned, and provides that the benefits shall be secured to the legal holder; and I think it is clear that a contract which entitles the bankrupt or his assignee to have the sum agreed upon paid to him in the event of his surviving until a certain date is property [citing many authorities]."

In Catchings v. Manlove, 39 Miss. 655, 661, it is held, in accord with the American authorities, that a policy of insurance upon the life of a person is a chose in action, and as such is liable to the payment of the debts of the party in whose favor it is issued.

Had the insurance company, on the default of Putnam, in the payment of the two notes maturing June 15, 1898, and January 1, 1899, obtained judgment, as it had a right to do, why could it not have sold Putnam's active interest on execution? And as the policy authorized an assignment, why would not the purchaser, by operation of law, become the assignee? At the time of the maturity of the first two notes Putnam had paid 11 annual premiums on the policy. Under the provisions of the Maine nonforfeiture law (which is shown in tabulated form on the margin of the policy), Putnam, having paid 11 annual premiums, was entitled to an extension of his policy for a period of 17 years 310 days from the date of his policy, or 6 years 300 days from the date of his last payment, without any further payment to the company. · So that the policy after the maturity of the two notes in question, and before Putnam's death, possessed a most valuable interest, which could have then been subjected to the payment of his matured obligations. Is it reasonable or just, therefore, to hold that by reason of the company's forbearance to proceed upon the past-due notes in the lifetime of Putnam it has lost its right to recoup said sums out of the amount of the policy, ripened into a full paid up policy by the death of the assured? It seems to me that this would be most inequitable.

It is difficult to escape the logic and instinctive sense of justice in the reasoning of the court in Skiles v. Houston, supra. After adverting to the case of Bosler's Adm'rs v. Bank, 4 Pa. 32, 45 Am. Dec. 665, the learned judge said:

"It will be perceived at once that if at Bosler's death the bank's right of action had been perfect against him the basis of the foregoing comment would be destroyed, and the other principle, also recognized, that mutual debts actually due and payable in the same right do ipso facto cancel each other, would have become applicable. In the present case the defendant's right of set-off already existed at the time of the plaintiff's death. But if it already existed it would be a strange anomaly to say that it is taken away by the nonmaturity at that same time of the decedent's claim against him. Plaintiff's counsel admit, and it is undoubtedly true, that if the intestate's claim against the defendant was mature at the intestate's death the right of set-off was complete. Why was not it equally complete in case of the then immaturity of intestate's claim? Certainly not because of anything decided in Bosler's Adm'rs v. Bank, because that decision denied the right only because it did not exist at the death of the intestate, and, as other rights intervened at the moment of the death, they could not be impaired by a right which only came into existence subsequently. Here the right of set-off existed prior to the death of the intestate, and therefore prior to the rights of the other creditors to equal distribution. The distinction is very plain, and does not require elaboration."

This distinction is observed by the supreme court of this state between matured and unmatured claims against the assignor in an assignment for the benefit of creditors. Homer v. Bank, 140 Mo. 225, 41 S. W. 790.

It results that the plaintiff is entitled to recover the amount of the policy, $5,000, diminished by the sum of the two notes of Putnam to the company, due at the time of his decease.